*327 OPINION OF THE COURT
Matthew F. Coppola, J.
On September 24, 1984 Lorraine Giampino died while giving birth at the Putnam Medical Center. An action alleging malpractice was instituted as against the hospital and the attending physician, Leonard Ricci. Following a jury trial held before this court, a verdict in the amount of $16,250,000 was returned, later reduced by the court to $2,750,000. Dr. Ricci was found to have been 70% responsible and Putnam Medical Center was found to have been 30% responsible.
Pursuant to CPLR article 50-B, the court, at that juncture, was required to process a judgment in keeping with the provisions thereof. However, the plaintiff urges upon the court the proposition that article 50-B is unconstitutional and seeks a determination striking down this statute. The plaintiff contends that applying the provisions of article 50-B would be tantamount to limiting recovery in a wrongful death action and therefore violative of article I, § 16 of the New York Constitution which provides that: "The right of action now existing to recover damages for injuries resulting in death, shall never be abrogated; and the amount recoverable shall not be subject to any statutory limitation.”
Article I, § 18, now § 16, was adopted at the Constitutional Convention of 1894. Plaintiff argues that this provision made a cause of action for wrongful death part of our fundamental law and, as such, it is immune to modifications limiting recovery. Plaintiff contends that CPLR article 50-B has the effect of limiting recoveries and therefore it must fall.
Article 50-B requires that should the jury return a verdict for the plaintiff, it will return an itemized verdict specifying the amount awarded for each item of special and general damages. It will further itemize the amounts intended to compensate the plaintiff for damages incurred to the date of trial and damages meant to compensate plaintiff in the future, through utilizing a verdict sheet such as that below outlined:
1. State the total amount awarded to the plaintiff
$-
2. State separately the amount awarded for the following items of damages, if any, up to the date of your verdict:
(a) Medical expenses; $_
(b) Loss of earnings; $_
(c) Rehabilitation services; $_
*328 (d) Pain and suffering up to the
date of your verdict. $_
Total $_
If you decide not to make an award as to any of the above items, you will insert the word "none” as to that item.
3. State separately the amount awarded for the following items of damages, if any, to be incurred in the future:
(a) Medical expenses; $.
(b) Loss of earnings; $.
(c) Rehabilitation services; $.
(d) Pain and suffering, including the
permanent effect of the injury. $.
Total $.
If you decide not to make an award as to any of the above items, you will insert the word "none” as to that item.
4. If you have any award for amounts intended to compensate the plaintiff for damages to be incurred in the future, then for each item for which an award is made, state the period of years over which such amounts are intended to provide compensation.
(a) Medical expenses; years
(b) Loss of earnings; years
(c) Rehabilitation services; years
(d) Pain and suffering, including the permanent
effect of the injury. years
Damages awarded in item 2 of the verdict sheet are to be paid in a lump sum together with those awarded in item 3 to a limit of $250,000 as well as counsel fees applicable thereto.
With regard to future damages in excess of $250,000, the court is to enter a judgment "for the amount of the present value of an annuity contract that will provide for the payment of the remaining amounts of future damages in periodic installments.” (CPLR 5041 [e].) Counsel fees for the amount remaining after lump-sum payment are to be predicated on the amount of the annuity.
Plaintiff contends that these provisions have the effect of limiting the award and accordingly do violence to the constitutional provision above recited. The Attorney-General, appearing as intervenor for purposes of defending the constitutionality of CPLR article 50-B, urges that the circumstances surrounding the adoption of article I, § 16 and the passage of article 50-B makes it quite clear that the enactment of article *329 50-B was well within the prerogative of the Legislature. Under the circumstances, an examination of the historical background attendant this area of the law may be helpful.
Traditionally the common law of England did not recognize a cause of action for wrongful death. Inasmuch as our common law tracked that of England, our rule was the same. In 1846, England adopted the Lord Campbell Act, the first statutory enactment of a wrongful death cause of action. In virtually the same language as that employed in the English statute, New York State in 1847 sanctioned a wrongful death cause of action providing that "the jury may give such damages as they deem fair and just compensation * * * with reference to pecuniary injuries.” (Rev Stat of NY, part III, ch IV, tit I, § 4.) In 1848 the statute was amended so as to limit recovery to $3,000 and the following year the limit was increased to $5,000. It was generally accepted that passage of the limitations of recovery provision was orchestrated by the railroad lobby. With this scenario as a backdrop, the Constitutional Convention of 1894 was held and article I, § 16 (then § 18) debated.
Having reviewed the statements of the delegates to that convention, I am satisfied that section 16 was adopted, not to preempt the Legislature from an ability to legislate further in this area, but rather to remove the onerous $5,000 limitation. Efforts aimed at amending the statute for this purpose continually failed enactment by the Legislature, where proposed amendments languished in committee year after year as the result of pressure from corporate lobbyists.
The arguments of Mr. Tekulsky, a delegate to the 1894 Convention and Chairman of the Committee on Preamble and Bill of Rights, made on the floor of the convention during the debate on section 16, when the delegates were considering whether the amendment in question was in effect a legislative function to be left to the Legislature for enactment, is of particular interest: "Mr. President, I wish to say that this is a matter for the Constitutional Convention. I claim that all things pertaining to the welfare of the people should be attended to here, especially where the Legislature has been appealed to year after year and has failed to do their duty by their constituents. We know what sort of men the Legislature of the State is quite often composed of. It is not composed of men of intelligence. It is not composed of men who have the welfare of the People at heart. It is composed of men who come to the Legislature for a purpose, just to make themselves *330 heard, and they never pass anything that will benefit the people where a corporation is interested.” (1 Revised Record of New York State Constitutional Convention of 1894, at 1108.)
And another delegate to that convention, a Mr. Dicky, after observing that a number of other States had adopted constitutional provisions fashioned along the lines of that proposed, went on to state: "In matters of salt legislation and canal legislation, I am inclined to follow my venerable friend from Onondaga for whom I have the highest respect, but in other matters I beg leave to differ with him, as I ask the privilege and the right and I am going to take it to myself, to oppose him, when he opposes woman’s suffrage and when he favors the restriction of $5,000 as the limit of recovery for death caused by negligence of anyone, corporation or person, because I think he is too tender to corporations and too hard on the women.” (Id., at 1122.)
There is little doubt that the convention acted to correct what was perceived as an injustice and not to embark on a course of action for all time. It is claimed however that in feeding a jury verdict through the wringer of article 50-B and coming out with fewer dollars for the estate of a deceased, we do violence to the Constitution as previously indicated.
A constitutional provision dating back to 1894 must be considered in the light of what is being experienced today. For certain, no one at that convention thought in terms of multimillion dollar verdicts, discount rates, calculation of interest, inflation factors, and spiraling medical and insurance costs. Can it be seriously urged that the Legislature is without the authority to address these considerations? I think not. Moreover, to a large degree, article 50-B does not lower the verdict as much as it brings the amount awarded within the context of what the parties might well have experienced economically had death not intervened.
CPLR article 50-B is found to be constitutional. I find that it does not violate article I, § 16 of the New York Constitution, that the Legislature acted within its power in enacting the statute. By making this determination I in no way mean to imply that the Legislature passed a perfect statute. It is not my function to set legislative policy so I will merely say that the statute is difficult to implement and should be reconsidered and amended. My sole function is merely to determine whether the Legislature could do what it did. This single question is answered in the affirmative.